[¡BYRNES, Judge.
The defendants appeal a judgment of January 30,1997 that awarded Cheryl Ann Brown Sommer damages for the defendants’ malicious defamation, interference with her employment and intentional infliction of mental suffering from the destruction of Ms. Sommer’s career. The trial court also awarded Ms. Sommer damages for lost income, punitive damages, attorney’s fees and interest. We affirm as amended.

STATEMENT OF THE CASE

On May 9, 1990, Cheryl Ann Brown Sommer sued the State of Louisiana, Department of Transportation and Development (DOTD), Mississippi River Bridge Authority, now the Crescent City Connection division of the DOTD (MRBA); Thomas E. Short, executive director of MRBA; Neil Wagoner, Secretary. of DOTD; J.L. Wax, undersecretary of DOTD; Webb Taylor, acting executive director of MRBA; Alan Levasseur, executive director of MRBA; Mark E. Falcon and the Avant and Falcon law corporation, agents and attorneys for the State, DOTD and MRBA; Randall Paisant, Assistant Executive Director of MRBA; and two unnamed insurers allegedly having provided insurance coverage respectively to DOTD, MRBA, its agents and employees, and the attorney and law firm.
| ¡.Ms. Sommer claimed that during 1988 and through January 3, 1989 she was a permanent civil service employee of MRBA with the rank of sergeant. She claims that she became ill in late 1988 and elected to use her previously accrued sick leave, compensatory leave and annual leave with the permission of her superiors, exhausting her sick leave on or about December 22, 1988. On January 3, 1989, she *928 was hired as a Customs Inspector by the Department of the Treasury, U.S. Customs Service (Customs) and signed a “light duty” form.
Ms. Sommer alleges that after she was hired by Customs, she continued to exhaust her MRBA employee benefits with the knowledge and permission of her MRBA superiors, in accordance with MRBA customary practice. During this time, she claims she was available to discuss MRBA related matters and duties with those superiors.
On or about May 10, 1989, upon Pais-ant’s initiation, the State, DOTD, MRBA, Short, Paisant, Wagoner, Wax, Taylor, Le-vasseur, Avant and attorney Falcon, under the color of law, conspired to have Ms. Sommer’s employment terminated by Customs in violation of unspecified constitutional rights and Louisiana law.
Short, with the approval of the other defendants, terminated Ms. Sommer from MRBA effective February 16,1989.
At the same time, Falcon, with the approval of the other defendants and using DOTD stationery, without having afforded Ms. Sommer due process, wrote to Customs alleging Ms. Sommer was under investigation by DOTD and that the agency intended to recoup the funds paid to her during the time she was employed by Customs. Wax received a copy of the letter. Approximately a week later, Falcon wrote to Customs on firm stationery alleging Ms. Sommer was violating the |3law by “milking the system” and using all of her accrued leave until she reached 300 hours. According to this letter, the State intended to recoup funds improvidently paid to Ms. Sommer and to have her dismiss her pending Civil Service Commission appeal. Falcon sent a similar message to another Customs official five days later. Two weeks later, Falcon wrote to David Hufft, Ms. Sommer’s attorney in the civil service appeal, characterizing Ms. Sommer’s conduct as fraudulent, stating that she should be held to a higher degree of integrity, that she was playing a game and implying that she might lose her job with Customs.
Ms. Sommer alleged that she did not learn of the defendants’ actions or the related investigation until early September 1989. She claims that as a direct result of these actions, she was terminated by Customs on December 8,1989.
Ms. Sommer claimed deprivation of property and equal protection rights, loss of income, damage to her personal and professional reputation and irreparable damage to her standing in the community, with her creditors and with the law enforcement community. She claims the State, DOTD and MRBA are responsible for her 42 U.S.C. § 1983 damages under the doctrine of respondeat superior and independently for their gross negligence amounting to conscious indifference. She sought actual damages, exemplary damages, attorney’s fees and judicial interest from demand. She also sought damages for defamation based on Falcon’s communications and for intentional infliction of mental suffering.
The State, DOTD, MRBA, Short, Wagoner, Wax, Taylor, Levasseur and Paisant answered the petition and asserted defenses of prescription and no cause of action, specifically disavowing the actions and statements of Falcon and his law firm. The matter was referred to mediation in 1995 under the Pilot Mediation |4Program of Civil District Court for the Parish of Orleans (Rule 18), which order was ultimately set aside and the matter was set for trial.
In her pre-trial submission, Ms. Sommer alleged that she is also entitled to recovery under La.R.S. 23:1006, employment discrimination, based on her gender.
Falcon and his law firm eventually settled Ms. Sommer’s claim and were dismissed prior to trial.
The remaining individual defendants, employees of DOTD or MRBA, moved their exception of no cause of action under 42 U.S.C. § 1983 prior to trial, which the *929 trial court denied. Following trial, the actions against defendants Wagoner and Taylor were dismissed. Discovery revealed that the state defendants were uninsured.
After a bench trial on the merits, the trial court rendered its January 30, 1997 judgment awarding Ms. Sommer the following:
General damages: $1,000,000.00
Lost income: + 837,263.00
Subtotal: $1,837,263.00
PLUS
Punitive damages
(15% of total award): $ 275,589.45
Attorney’s fees (15% of total award) +275,589.45
Subtotal: $ 552,278.90
FINAL AWARD: $1,837,263.00
+ 552,278.90
TOTAL: $2,389,541.90
PLUS INTEREST
lsThe judgment found that the following defendants were liable in solido: the State through DOTD and MRBA, J.L. Wax, Randall Paisant, Thomas Short, and Alan Levasseur.

Reasons for Judgment

The trial court issued detailed written reasons for judgment. He found that in 1988 Ms. Sommer was a sergeant with MRBA. In September, she developed a bronchial infection and went on sick leave. While on sick leave, on November 20,1988, she received an offer of employment from Customs, to which she had applied several years before. Because MRBA policy did not confine employees to their homes while on sick leave, Ms. Sommer accepted the Customs offer and attended school in Glen-co, Georgia. She did not resign from MRBA because no one else had ever had to resign under those circumstances and she was not sure that Customs would offer her a permanent position at the conclusion of her one year probationary period.
The trial court found that the evidence was uncontradicted that MRBA policy did not require a person on sick leave to remain confined to her domicile. This policy was confirmed by Shaw’s testimony and by Falcon’s testimony on cross-examination. Further, at the discretion of the appointing authority, an employee could use accrued annual leave, in lieu of sick leave, once the employee’s sick leave has been exhausted. The trial court also found that official MRBA policy allowed an employee to take up to three hundred hours of accrued annual leave prior to terminating employment. Where an employee had accrued more than three hundred hours of annual leave, MRBA instituted a practice known as “running your time out” which allowed the employee to take the excess annual leave in lieu of sick leave prior to resignation. Frank Shaw, chief of MRBA police, | ^testified that this policy was in place until Levasseur became MRBA director in mid-December, 1989. MRBA assistant police chief Michael Helmstetter’s contrary testimony was rejected by the trial court, which found it incredible in light of Helmstetter’s comment in his letter of January 10,1990 that it was common practice for an officer to exhaust all sick leave accrued before resigning.
The trial judge also found that DOTD and MRBA knew Ms. Sommer had accepted the job as probationary Customs Inspector. Ms. Sommer testified that she had many conversations with her MRBA supervisors about the Customs pre-ap-pointment process. She applied to take hours off work to take her oral board examination. She normally dealt with deputy superintendent Michael Helmstet-ter, and recalled having discussed with him the necessity of her attendance at hazardous material school in connection with her Customs application. She also discussed her Customs application with superintendent Frank Shaw and testified to having asked him for time off to pursue her career goal with Customs. She had a part-time position with Shaw’s business, Tactical Defense Institute, and advised him that she would not be able to continue to work for the Institute because of the Customs appointment. Shaw’s testimony *930 confirms that it was common knowledge in 1989 that Ms. Sommer intended to attend the Customs academy. In connection with Customs’s background check, a Customs representative advised three MRBA employees of the situation, including Thomas J. Freeman, who testified that he told defendant Paisant about the interview and had seen on the MRBA bulletin board a postcard sent by Ms. Sommer from Customs Academy in Georgia. William Brown, III, Ms. Sommer’s ex-husband and co-worker at MRBA during the relevant period, testified that he told his supervisors, Shaw and Helmstetter, that Ms. Sommer had a job with Customs. The judge concluded that it was widely known |7at MRBA that Ms. Sommer was attending Customs school and that Ms. Sommer held the good faith belief that she was not violating MRBA policy and that MRBA would give her notice that her annual leave in lieu of sick leave was being discontinued.
The trial court also found, contrary to the statement contained in MRBA’s letter of February 9, 1989, that MRBA did not have to fill Ms. Sommer’s position as sergeant. MRBA never listed the position as being vacant or sought qualified candidates; MRBA did not introduce a job announcement form at trial. Several witnesses testified that Freeman filled Ms. Sommer’s watch position. Documentary evidence shows he was absent fifty percent of the time on annual leave in lieu of sick leave just prior to his resignation in April 1989. The trial court concluded that Freeman was running out his leave time in the same way Ms. Sommer had done.
The trial court found that defendants were unable to determine that she was unable to return to work since they did not contact her Georgia doctor, request an independent medical examination or discuss the situation with Ms. Sommer.
The trial court found no evidence showing that Ms. Sommer’s termination under Civil Service Rule 12.0 was supported, and noted that MRBA capitulated in Ms. Som-mer’s civil service appeal and restored her to full duty with the State.
The trial court found that Ms. Sommer’s termination by MRBA could not be justified under Civil Service Rule 12.10. The trial court concluded that Ms. Sommer was properly on annual leave in lieu of sick leave, a change of status made by Shaw. Ms. Sommer had an additional 600 hours of annual leave, ample time to be credited to sick leave under the MRBA policy in existence prior to Levasseur’s succeeding to the directorship.
| aWhile the parties agree that Levass-eur, as director of MRBA, had the discretion to change the policy on running time, the trial court found MRBA was not required to terminate Ms. Sommer under the new policy, but simply could have discontinued Ms. Sommer’s leave status and required her to return to work. Indeed, Helmstetter and Short admitted that to their knowledge no one other than Ms. Sommer had been terminated for having run out their accrued leave time.
The trial court rejected Paisant’s testimony that he had been unaware that Ms. Sommer was attending Customs school in Georgia while on sick leave. The trial court accepted Freeman’s testimony that he had mentioned to Paisant that Ms. Sommer was in Customs school. In addition, the trial court found it hard to imagine that Paisant, as assistant executive director of MRBA, would have been unaware of the November 1988 visit to Paisant’s office by a United States Customs Agent who investigated Ms. Som-mer’s background.
David Hufft, Ms. Sommer’s attorney in her civil service appeal, testified that based on his knowledge and conversations with A.J. Bonfanti, deceased former MRBA counsel, he believed MRBA’s action was motivated by a desire to retaliate against Ms. Sommer for having testified against MRBA in the case of Lon Fleetwood, an MRBA employee charged with battery and exceeding his jurisdiction.
*931 The trial court found further evidence of MRBA’s animus in Paisant’s action requiring Ms. Sommer to provide medical documentation of her sick leave where leave slips of numerous MRBA employees were introduced at trial, none of which required medical documentation. The trial court found additional evidence of Paisant’s bad faith in his failure during his February 9, 1989 conversation with Ms. Sommer to ask her about her condition, whether she planned to return to MRBA [ fland whether she was employed by the federal government. Neither did he consult with her doctors concerning her medical condition.
The trial court found that Falcon acted in compliance with directives of his employer, MRBA, when he wrote letters to Customs. The trial court found these communications were initiated by Falcon, and were not solicited by Customs. The trial court apparently did not consider Falcon’s relationship with DOTD/MRBA to be one of independent contractor/counsel, since the reasons for judgment consistently refer to DOTD/MRBA as Falcon’s “employer.” He notes that Falcon wrote initially to Customs on DOTD stationery, an action inconsistent with independent contractor status.
In spite of the medical documentation of Ms. Sommer’s condition and without having further investigated the issue of her medical status, Falcon advised Customs that Ms. Sommer had fraudulently run out her leave with MRBA. Customs was also given copies of MRBA’s termination letter and Ms. Sommer’s medical records, together with Falcon’s conclusion that DOTD believes that “she was milking the system” by using her accrued annual leave. The letter also threatened to recoup the funds paid to Ms. Sommer and to have her dismiss her civil service appeal.
Another example of Falcon’s animus is found in his letter of June 8, 1989 to David Hufft, who represented Ms. Sommer in her civil service appeal, characterizing Ms. Sommer’s actions as fraudulent. In that letter, Falcon recognizes that Ms. Sommer could lose her Customs job. The trial court concluded from that fact that Falcon knew the activity was specifically and maliciously directed at causing Ms. Sommer to lose her job as a Customs Inspector. Falcon admitted that he knew Ms. Sommer was subject to dismissal during the one year |inprobationary period. The trial court found it outrageous that by August 15, 1989 Falcon was trying to quietly handle the civil service appeal with Hufft, because Falcon was aware of Ms. Som-mer’s pending discharge from Customs. The trial court noted that the Customs termination letter of December 4, 1989 essentially outlined and used information furnished by MRBA. The trial court apparently did not accept the testimony of James Piatt, Director of the Custom Service’s Dallas Strategic Trade Center, that Ms. Sommer lost her job with Customs because she had not told them of her knee injury or that she was still working for MRBA. On cross-examination, Piatt was confronted with an invoice from the Federal Law Enforcement Training Center, Office of the Athletic Trainer, showing Ms. Sommer’s knee rehabilitation while at the Glenco training facility. Piatt was unable to delineate the requirements of an MRBA full duty police assignment or to compare them to the rigors of Customs Academy training. Neither he nor his assistant, Diane Tudzin, investigated Ms. Sommer’s claim of resolving bronchial infection or knee injury. He admitted that he did not know for a fact that Ms. Sommer told no one at MRBA of her new job at Customs or that she told no one at Customs that she was still employed by MRBA.
The trial judge did not give great weight to Falcon’s testimony, finding that he was extremely difficult to examine and that he “skillfully tried to dance around answering most of the questions posed to him.”
According to the trial judge, once Falcon became involved in the case, he recognized that MRBA’s letter of February 9, 1989 was insufficient pre-deprivation notice to Ms. Sommer under the rule of Cleveland *932 Board of Education v. Loudermill, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985), which requires pre-termination notice and an opportunity for the accused employee to be heard. InHufft testified that in his opinion as an expert attorney, experienced in handling civil service cases, the letter was insufficient since the decision to terminate Ms. Sommer had already been made.
From a finding that Falcon discussed rescinding the termination action because of the Loudermill problem but then changed his mind, believing that it was his job to make the termination “stick” despite the defective notice letter, the trial court concluded that although MRBA knew its termination of Ms. Sommer was procedurally and substantively improper, MRBA was going to do whatever was necessary to terminate Ms. Sommer and to have that termination sustained. From this, the trial court found defendants to have demonstrated a reckless, careless indifference to Ms. Sommer’s constitutional right to maintain employment. He also concluded that defendants caused Customs to terminate Ms. Sommer’s employment. He found that there was strong evidence that defendants were motivated by dislike of Ms. Sommer’s choice of a minority spouse, by Wax’s desire to make an example of her and by Falcon’s effort to prove himself to be a tough, effective attorney in this, his first case on behalf of DOTD.
The trial court found defendants guilty of intentional interference with Ms. Som-mer’s employment, “defamation and slander’^sic].[1]
The trial judge found that while in Georgia, Ms. Sommer suffered a recurrence of a prior knee injury for which she was treated by Dr. J. Melvin Deese, Jr. She testified that she completed the Customs initial physical efficiency battery’s untimed one and one-half mile walk/run in twenty-eight minutes and in serious pain. Former Customs Inspector James Keith Gad-dy testified that the Customs | ^academy training was not particularly strenuous, the most demanding aspect being this one and one-half mile run.
Dr. Deese examined Ms. Sommer and advised her that she was unable to return to work until April 18, 1996. We concluded that this to be a clerical error, since there is no evidence supporting the 1996 date. It appears that the correct date is April 18, 1989. She was allowed to continue with Customs on light duty status. Short wrote to Ms. Sommer on January 12, 1989 contending that she was no longer incapacitated since she was able to leave her domicile. Short’s letter advised her to return to work at MRBA by January 17, 1989 or submit medical evidence of illness. Ms. Sommer forwarded complete medical records, including photographs and Dr. Deese’s report, to Short. On February 9, 1989, Ms. Sommer was advised that her medical records had been received by MRBA, but that she was terminated pursuant to Civil Service Rule 12.10 effective February 16, 1989. Ms. Sommer appealed the termination.
The trial court found that in mid-1989 Falcon, on Wax’s instruction, began advising Customs that Ms. Sommer illegally and in bad faith was dually employed by MRBA and Customs. These contacts took place after MRBA sent its termination notice to Ms. Sommer. The trial court found that as a result of these contacts Customs terminated Ms. Sommer in December 1989, just- prior to the expiration of her probationary period.
The trial court found that Ms. Sommer’s civil service appeal of the MRBA termination was settled and she was returned to employment by MRBA when it was shown that she had been illegally deprived of a hearing prior to having been fired. At no time did any defendant take any action to recover the funds they [^contended Ms. Sommer had obtained fraudulently and illegally. The trial court concluded that this *933 was further indication of defendants’ malicious intent.
The trial court rejected defendants’ privilege claim. Initially, he found the defense of truth to be inapplicable. He found that Ms. Sommer was not employed by MRBA at the time defendants claimed she was guilty of dual employment. Ms. Sommer was not a “prospective employee” of Customs since she had already received her Customs appointment. Further, dual employment was the basis of neither her termination from MRBA nor of her civil service appeal; according to the trial court, dual employment was alleged solely as a vehicle to cause her termination by Customs. The trial court found the defamatory statements clearly were not made in good faith, nor were they made in legal briefs, pleadings or arguments, but were made solely to impugn her character and to question her honesty, leading to her termination by Customs.
The trial court found that upon her reinstatement at MRBA, following the civil service appeal, Ms. Sommer was subjected to a pattern of harassment designed to cause her to quit her MRBA job. The trial court noted various specific incidents which he characterized as harassment.
Former Customs agent James Keith Gaddy testified to the promotion policy and GS levels relevant to customs agents such as Ms. Sommer. The trial court accepted the uncontroverted testimony of Ms. Sommer’s economist, Dr. Melvin Wolf-son, that she suffered lost income to trial in the amount' of $80,773 and total lost income of $837,263, including those allegedly occasioned by alleged total, permanent disability resulting from Ms. Som-mer’s arrest of a narcotics suspect while employed by MRBA in 1994.
| uThe trial court awarded $1,000,000 in general damages due to defamation and to the egregious mental suffering Ms. Som-mer has endured for the last eight years and continues to suffer, and for the destruction of her emotional life, her lifetime ambition to be a customs agent and the personal devastation of her future.
Finding outrageous, malicious, reckless and callous indifference to Ms. Sommer’s constitutionally protected rights, the trial court awarded fifteen percent of the total award as punitive damages. Referring to the voluminous documentary exhibits, years of pre-trial work, numerous depositions, writ applications and the three week trial, the trial court awarded an additional fifteen percent of the total award as attorney’s fees.
On appeal, the defendants contend that the trial court erred in finding that: the defendants were liable for defamation and were the cause of Ms. Sommer’s termination from Customs. Defendants also assert that the trial court erred in finding they were liable for intentional interference with Ms. Sommer’s employment, intentional infliction of mental distress, and constitutional deprivations. Defendants argue that the State entities were immune from punitive damages and attorney’s fees. The defendants also maintain that the trial court did not have subject matter jurisdiction over Ms. Sommer’s claims as a classified civil servant. Defendants contest their liability as individuals, as well as State entities. They also contend that the damage awards are excessive.

Standard of Review

It is well settled that a trial court of appeal may not.set aside a trial court’s finding of fact in the absence of “manifest error” or unless it is “clearly wrong,” and where there , is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed on review, even though |1Bthe appellate court may feel that its own evaluations and inferences are as reasonable. Where there are two permissible views of the evidence, the fact-finder’s choice between them cannot be manifestly erroneous or clearly wrong. Appellate courts must constantly have in mind that their initial review function is not to decide factual issues de novo. When findings are *934 based on determinations regarding the credibility of witnesses, the manifest error — clearly wrong standard demands great deference to the trier of fact’s findings; for only the fact-finder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener’s understanding and belief in what is said.
However, where documents or objective evidence so contradict a witness’s story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness’s story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. Where such factors are not present, and a fact-finder’s finding is based on its decision to credit the testimony of one or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong. Rosell v. ESCO, 549 So.2d 840, 844-845 (La.1989). See also, Hill v. Morehouse Parish Police Jury, 95-1100 (La. 1/16/96), p. 4, 666 So.2d 612, 614; Ferrell v. Fireman’s Fund Ins. Co., 94-1252 (La.2/20/95), 650 So.2d 742, 745; Stobart v. State through Dept. of Transp. and Development, 617 So.2d 880 (La.1993); Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
Of course, where, trial court legal errors have tainted the fact finding process, the judgment is not reviewed under the manifest error standard and, if the record is complete, the appellate court may make a de novo review of the record and 1 ^determine the preponderance of the evidence. Rosell v. ESCO, supra, 549 So.2d at 844 fn. 2 (La.1989); Gonzales v. Xerox Corp., 320 So.2d 163 (La.1975).
We are instructed that before a fact-finder’s verdict may be reversed, we must find from the record that a reasonable factual basis does not exist for the verdict, and that the record establishes the verdict is manifestly wrong. Lewis v. State Through Dept. of Transp. and Development, 94-2370 (La.4/21/95), 654 So.2d 311, 314; Stobart v. State through Dept. of Transp. and Development, supra. Although we accord deference to the fact-finder, we are cognizant of our constitutional duty to review facts,[2] not to decide if we, as a reviewing court, would have found the facts differently, but to determine whether the trial court’s verdict was manifestly erroneous, clearly wrong based on the evidence, or clearly without evidentiary support. Ambrose v. New Orleans Police Department Ambulance Service, 93-3099 (La.7/5/94), 639 So.2d 216, 221; Ferrell v. Fireman’s Fund Ins. Co., supra.
As to quantum issues, our initial inquiry is whether the award for the particular injuries and their effects under the particular circumstances on the particular injured person is a clear abuse of the “much discretion” of the trier of fact. Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149 (1963). Only after such a determination of an abuse of discretion is a resort to prior awards appropriate and then only to assist the court in determining the highest or lowest point which is reasonable within that discretion. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976); Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993) cert. den. 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994).
|17The standard for appellate review of general damage awards is difficult to express and is necessarily non-specific, and the requirement of an articulated basis for disturbing such awards gives little guidance as to what articulation suffices to justify modification of a generous or stingy award. Nevertheless, the theme that emerges from the jurisprudence is that the discretion vested in the trier of fact is “great, ” and even vast, so that an appellate court should rarely disturb an award of general damages. It is only when the award is, in either direction beyond that *935 which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award. Youn v. Maritime Overseas Corp., supra.
The awards must not be obviously the result of passion or prejudice, and they should bear a reasonable relationship to the elements of the proved damages. To reduce the trier of fact’s award, we must conclude from the entirety of the evidence viewed in the light most favorable to the plaintiff, that a rational trier of fact could not have fixed the awards of general damages at the level set by the trial judge or that this is one of those “exceptional cases where such awards are so gross as to be contrary to right reason.” See, Bartholomew v. CNG Producing Co., 832 F.2d 326 (5 Cir.1987); Youn v. Maritime Overseas Corp., supra.
The standard of review for damage awards requires a showing that the trier of fact abused the great discretion accorded in awarding damages. In effect, the award must be so high or so low in proportion to the injury that it “shocks the conscience.” Moore v. Healthcare Elmwood, Inc., 582 So.2d 871 (La.App. 5 Cir.1991).
[ Assignments of En-or
We shall first consider those assignments of error which raise issues of law, as to which the manifest error standard of review is not applicable.

Eighth and Eighteenth Assignments of Error

Defendants argue that the evidence shows that DOTD had the discretion to grant or revoke annual leave in lieu of sick leave and the trial court was clearly wrong in finding that DOTD did nothing to disallow Ms. Sommer’s use of annual leave in lieu of sick leave and in failing to find that DOTD’s actions were protected under the Louisiana discretionary acts doctrine. The defendants contend that the trial court was clearly wrong in failing to find that defendants Wax, Short, Paisant and Levasseur were at all times acting in official capacities, performing discretionary functions, that their actions were objectively reasonable, did not violate plaintiffs rights, and were thus protected by qualified and good faith immunity.
The Louisiana discretionary acts doctrine is found in La.R.S. 9:2798.1, which provides in pertinent part:
B. Liability shall not be imposed on public entities or their officers or employees based upon the exercise or performance or the failure to exercise or perform their policymaking or discretionary acts when such acts are within the course and scope of their lawful powers and duties.
C. The provisions of Subsection B of this Section are not applicable:
(1) To acts or omissions which are not reasonably related to the legitimate governmental objective for which the policy-making or discretionary power exists; or
(2) To acts or omissions which constitute criminal, fraudulent, malicious, intentional, willful, outrageous, reckless, or flagrant misconduct.
|1flThe statute protects a governmental agency from liability at the policy making or ministerial level, not at the operational level. Fowler v. Roberts, 556 So.2d 1, 15 (La.1989). This Court held that the two step analysis to determine if the statute applies requires the court to first decide if the governmental action is a matter of choice, and, if so, whether the government’s selection of alternative choices was policy based. Boguille v. Chambers, 96-1173 p. 11 (La.App. 4 Cir. 12/11/96), 685 So.2d 582, 589, citing Rick v. State, DOTD, 93-1776 (La.1/14/94), 630 So.2d 1271.
While the governmental action taken in this case was a matter of choice, it cannot be held to be policy-based. Even if defendants argue that the decisions were *936 somehow policy based, the activities ' of which plaintiff and which the trial court found come within the provisions of La. R.S. 9:2798.1 C(l) and (2). The defendants’ actions were malicious and intentional, thus denying them the benefit of the discretionary acts doctrine.
This assignment of error is without merit.

Thirteenth Assignment of Error

The defendants maintain that the trial court judgment is tainted by legal error because there is no Louisiana cause of action for intentional interference with employment.
The evidence supporting the defamation and conspiracy claims is the same evidence supporting the trial court’s finding of intentional interference with the employment contract between Ms. Sommer and Customs. The general and special damages arising from loss of the Customs job are likewise identical. This assignment of error is therefore moot.
| ^Fourteenth Assignment of Error
The State entities assert that the trial court was clearly wrong in denying defendants’ exceptions of no cause of action under 42 U.S.C. § 1983 for the following reasons: (1) defendants are not “persons” within' the meaning of the statute; (2) plaintiff had no constitutionally protected property right to continued employment; (3) plaintiff was not deprived of a constitutionally protected right, interest or immunity. The defendants aver that the trial court therefore erred in finding the State through its public entities liable for compensatory damages, punitive damages and attorneys’ fees under the federal statute.
The federal civil rights statute, 42 U.S.C. § 1983, provides in pertinent part:
Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law....
In Will v. Michigan Dept. of State Police, 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989), the United States Supreme Court held that state officials acting in their official capacities are outside the class of persons subject to liability under 42 U.S.C. § 1983. However, the Court rejected the notion that this language means that the statute does not authorize suits against state officers for damages arising from official acts. Indeed, state officials sued in their individual capacities are persons for purposes of 42 U.S.C. § 1983. Hafer v. Melo, 502 U.S. 21, 22-23, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991).
In Kentucky v. Graham, 473 U.S. 159, 165, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985), the Court emphasized that official capacity suits generally represent only another way of pleading an action against the entity of which an officer is an agent. 1 ¡h When an official sued in his official capacity in such a suit dies or is otherwise replaced in office, the successor is substituted and automatically assumes his role in the litigation. See Fed. Rule Civ.Proc. 25(d)(1); Fed.Rule App.Proc. 43(c)(1); United States Supreme Court Rule 35.3. Because the real party in interest in an “official capacity” suit is the governmental entity, and not the named official, the entity’s policy or custom must have played a part in the violation of federal law. For the same reason, the only immunities available to the defendant in an official-capacity suit are those that the governmental entity possesses. Hafer, supra, 502 U.S. at 25,112 S.Ct. 358.
Personal capacity suits, on the other hand, seek to impose individual liability upon a government officer for actions taken under color of state law. Thus, on the merits, to establish personal liability in a 42 U.S.C. § 1983 action, it is enough to show that the official, acting under color of state law, caused the depri *937 vation of a federal right. While the plaintiff in a personal-capacity suit need not establish a connection to governmental policy or custom, officials sued in their personal capacities unlike those sued in their official capacities, may assert personal immunity defenses such as objectively reasonable reliance on existing law. Id.
In Will, supra, the court held that to interpret the words “every person” in 42 U.S.C. § 1983 to exclude the States accorded with the most natural reading of the law, with its legislative history, and with the rule that Congress must clearly state its intention to alter the federal balance when it seeks to do so. Will, supra, 491 U.S. at 65, 109 S.Ct. 2304. However, the Hafer case makes it clear that a government official in the role of a personal-capacity defendant fits comfortably within the statutory term “person.” Hafer, supra, 502 U.S. at 27, 112 S.Ct. 358. Acts outside the official’s authority and not essential to the operation of state government as well as those within the | ¡.¿.official's authority and necessary to the performance of governmental functions can subject an official to 42 U.S.C. § 1983 liability. Id.
In the present case the trial court accepted Ms. Sommer’s contention that her right to continued employment in the federal system is a constitutionally protected property right. Whether a government employee has sufficient property interest in employment to be protected by due process is generally a matter of state law. Calhoun v. Gaines, 982 F.2d 1470 (10 Cir.1992). Failure to provide due process to an employee with a property interest in state employment is actionable under 42 U.S.C. § 1983. Buttitta v. City of Chicago, 9 F.3d 1198 (7 Cir.1993). There, the issue was whether § 5-156 of the Chicago Police Pension Act created a property interest. In recognizing a property interest, the appellate court noted that where the act provided that the authority should return an officer to active service following a finding that his disability has ceased, the individual officer has a property right in being returned to the department for an opportunity to demonstrate his fitness for active duty.
This situation is analogous to the plaintiffs right to demonstrate to MRBA her ability or disability — her right to return to full duty status or some limited duty status consistent with her disabilities. This assignment of error is without merit as to the individual defendants, Short, Paisant and Wax.
Generally, as to the State, through the public entities MRBA and the DOTD, the rule in Will would deny plaintiff recourse under 42 U.S.C. § 1983. However, in Will, supra, 109 S.Ct. at 2312, the Supreme Court also stated: “The Eleventh Amendment bars such suits unless the State has waived its immunity.” Id., 109 S.Ct. at 2309-2310 [Emphasis added]. This language shows that immunity can be waived by the State through its public entities. Immunity is an affirmative defense | ¡^that must be pleaded by a defendant or that defense is capable of being waived. Moresi v. State Through Dept. of Wildlife and Fisheries, 567 So.2d 1081, 1086 (La.1990). In the present case the State, through its public entities and their employees, waived the right to immunity because the defendants did not plead immunity from liability as an affirmative defense.
In the present case the State through the DOTD, MRBA, and their officials are not barred from a suit for damages under 42 U.S.C. § 1983 and La. R.S. 9:2798.1. Punitive damages can be awarded in a Louisiana state court, alleging a violation of 42 U.S.C. § 1983, where the defendant’s conduct is shown to be motivated by evil motive or intent, or when the defendant’s conduct involves reckless or callous indifference to federally protected rights of others. Booze v. City of Alexandria, 94-0763 (La.4/4/94) 637 So.2d 91, 92; Smith v. Wade, 461 U.S. 30, 56, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983). Further, 42 U.S.C. *938 § 1988 provides for recovery of attorney fees and is applicable in state proceedings. Because the State entities waived their right to claim immunity, the trial court did not err in holding the governmental defendants, including the State through the DOTD, and MRBA, solidarily liable with the individual defendants, Paisant, Short and Wax for all damages and attorney’s fees.

Twenty-third and Twenty-fourth Assignments of Error

Defendants argue that the trial court had no jurisdiction to rule on DOTD leave policies, MRBA leave practices, Ms. Som-mer’s use of leave and complaints of discrimination, harassment and interference with employment at MRBA, these matters being within the exclusive jurisdiction of the Louisiana State Civil Service Commission. The defendants submit that the trial court lacked subject matter | ^jurisdiction over Ms. Sommer’s claims involving leave practices, discrimination and employment matters.
The Louisiana Constitution vests exclusive jurisdiction in the State Civil Service Commission to decide all classified civil service employee disputes involving discrimination, interference with employment and employee leave. La. Const, of 1974, Art. X, §§ 10 and 12. This Court held in Eberhardt v. Levasseur, 630 So.2d 844 (La. App. 4 Cir.1993) that the Civil Service Commission has exclusive jurisdiction over classified Civil Service employer-employee disputes that are employment related. Examples cited were complaints alleging violation of a Uniform Classification and Pay Plan; suit for interference with the employee’s civil service job by transferring the employee from a higher to a lower classification; and a claim that an employee was entitled to a promotion because of a union contract. However, this Court specifically recognized that the district court had jurisdiction over Ms. Sommer’s action under 42 U.S.C. § 1983. By analogy, Sommer’s actions for defamation and interference with her employment with Customs are within district court jurisdiction.
While defendants’ leave practices and policies are relevant insofar as deviation therefrom comprises part of the evidence of conspiracy, the propriety of those regulations and of Ms. Sommer’s original termination by defendant MRBA, vel non, is not at issue. That termination was the subject of the appeal before the Louisiana State Civil Service Commission, in which defendant MRBA capitulated, rehiring Ms. Sommer. However, Ms. Sommer’s claims for harassment and discrimination leading her to leave her re-acquired position with MRBA áre subject to the exclusive jurisdiction of the Civil Service Commission.
1 gsFor these reasons, we reverse that portion of the judgment casting defendants responsible for damages for employment discrimination, and harassment leading to the termination of Ms. Sommer’s second MRBA employment.

Twenty-fifth Assignment of Error

Defendants argue that the trial court failed to allocate fault to settling defendants Falcon and his law firm.
He who conspires with another person to commit an intentional act is answerable, in solido, with that person for the damage caused by that act. It is only where there is no solidary liability that a joint tort-feasor is liable for no more than his degree of fault. See, La.C.C. art. 2324(A) and (B).
The evidence outlined in our consideration of the seventeenth assignment of error, infra, is sufficient under the manifest error standard of review to support the trial court’s finding of conspiracy among the defendants. Therefore, this assignment of error is without merit.
We shall consider separately those assignments alleging that certain of the trial court’s findings of fact are manifestly erroneous or an abuse of discretion.

*939
First, Second, and Third Assignments of EtTor

The defendants contend that the trial court was clearly wrong in finding that the communications to Customs and Ms. Som-mer’s counsel were defamatory. The trial court was clearly wrong in: finding actionable defamation, failing to find truth as an absolute defense, and finding malice.
To prevail on a claim of defamation, plaintiff has the burden of proving by a preponderance of the evidence five essential elements: defamatory words, | ^publication, falsity, malice and resulting injury. If even one of these elements is absent, the cause of action fails.
Defendants contend that Ms. Sommer was not defamed. Defamatory words are those which tend to harm the reputation of another so as to lower him in the estimation of the community or to deter third persons from associating with him. To be actionable, the words must be communicated or published to someone other than the plaintiff. Words that expressly or implicitly accuse another of criminal conduct or that, by their nature, tend to injure one’s personal or professional reputation are considered defamatory per se. If the plaintiff proves publication of defamatory per se words, the elements of falsity, injury and malice are presumed, although they may be rebutted by the defendant. Arledge v. Hendricks, 30-588 pp.3-4 (La.App. 2 Cir. 6/26/98), 715 So.2d 135, 138.
Defendants contend in brief that Ms. Sommer failed to prove the falsity of Falcon’s statements. In his letter of May 10, 1989, on DOTD stationery, to Customs Service Headquarters in Washington, D.C., Falcon stated:
Since the latter part of 1988, Ms. Brown [sic] has been off of work on sick leave due to an alleged disability.
In fact, Ms. Sommer used her sick leave and then began to run out her accrued annual leave, in accordance with MRBA policy. Shaw testified that although running out time was not what he called “standard practice,” it was “understood practice” in that it had happened on numerous occasions before. It did not make any difference, whether they ran sick time or compensatory time or annual leave.
During this time, she earned full wages until she was removed from her position in accordance with State Civil Service Rules, effective February 16,1989.
|27In fact, her termination was not in accordance with Rule 12.10 or any other Louisiana Civil Service rule.
We recently learned that Ms. Sommer has been employed by the U.S. Customs Service since January of 1989.... This-agency is investigating Ms. Sommer’s alleged disability and simultaneous full-time employment with the State of Louisiana and the United States Government. I trust that your office likewise is concerned with this situation.
The clear implication of the foregoing is that Ms. Sommer is guilty of wrong-doing. The statement again fails to advise Customs that Ms. Sommer’s actions were in conformity with accepted MRBA practice.
With his transmittal letter of May 16, 1989 to Win Wolff of the Customs Service’s Houston office, Falcon sent the MRBA’s termination letter, erroneously accusing her of having violated the MRBA’s leave policies.
In his letter of May 18, 1989 to Wolff, Falcon wrote:
We believe that she [plaintiff] was milking the system by using all accrued vacation pay down to 300 hours of annual leave since our Civil Service Rules require that the employee be paid cash for a maximum of 300 hours of annual leave upon termination.... We intend to recoup all funds improvidently paid to her as well as have her dismiss her challenge to her removal....
There, Falcon repeats his misstatement of the conditions under which Ms. Sommer used accrued annual leave in lieu of sick *940 leave, and characterizes her actions in a pejorative manner as milking the system.
By letter of transmittal dated May 23, 1989, Falcon re-published to Joel Ruben-stein of the Customs Service’s Washington headquarters the defamatory correspondence originally sent to Wolff.
In his letter of June 6, 1989 to Hufft, Falcon stated:
li»R... [I]t is apparent that Ms. Sommer’s use of sick leave, compensatory leave and annual leave prior to her removal was fraudulent. Her assurances and correspondence indicating her continued disability obviously evidences her attempt to receive funds from the State of Louisiana to which she was not entitled. The Customs Service is likewise looking into this issue. Customs’ inspectors, like sergeants with the [MRBA], are held to a higher degree of integrity. I anticipate that she may likewise lose her job with that Agency.
Falcon reiterates his claim of fraud in his letter of August 15, 1989 to Hufft. Falcon apparently spread his slander by telephone contact to Drew Hatcher, Senior Attorney in the Customs Service’s Office of the Chief Counsel in Washington, D.C. In a letter dated October 16,1989, Hatcher wrote:
In a recent telephone conversation, you informed me that your law firm has been retained by the State of Louisiana ... and that your investigation of [plaintiffs] claim has uncovered evidence which leads you to believe that the claim was fraudulently filed.
Shaw testified on re-direct examination that there was no information in Ms. Som-mer’s file that would refute the proposition that Ms. Sommer furnished proper documentation to obtain her sick leave. Based on his investigation, Ms. Sommer was never out of her department without proper documentation. He was never asked to approve the change in Ms. Sommer’s leave classification. Although he was Ms. Som-mer’s supervisor, none of the individual defendants asked him if he thought Ms. Sommer should be fired or asked him if she was violating MRBA leave policy.
Shaw also made clear that Ms. Som-mer’s full police duty at MRBA was very heavy duty, and that mere ability to leave her house, as suggested in her termination letter, was not an activity prohibited while on sick leave.
| ¡¡¡(Falcon admitted that employees on annual leave were not subject to termination, and could, during that leave period, do anything they wished. His initial discussion of Ms. Sommer’s case were carried on among Wax, Bonfanti and himself.
Allegations of fraud, lack of integrity, and of milking the leave system are clearly contrary to the information available to Falcon and the state defendants at the time of these letters and telephone communications. There is ample evidence of record to support the trial court’s finding that the defamatory statements were false.
Because the words used in the correspondence to Customs are defamatory per se, malice is presumed. To rebut this assumption, defendants have the burden of proving a reasonable belief in the truth of the statements. See Arledge v. Hendricks, supra.
We find no evidentiary basis for a conclusion that defendants proved a reasonable belief in the truth of the defamatory statements. Although we find no eviden-tiary basis for the trial court’s conclusion that MRBA “instituted” the practice of running out time, it is clear from the record that MRBA at least acquiesced in or tolerated the practice. Ms. Sommer introduced leave records from December 1988 through April 1989, of other MRBA employees Donald Dardar, Thomas Freeman, Harvey Johnson, Gail Julian, Glenn Kil-leen, William Brown, Jimmy Leach, Gary Yacher and M. Helmstetter to support the claim that annual leave could be taken in lieu of sick leave. Similar records were introduced for the period September to December 1988 for employees Mark and *941 Robert Porche (including leave slips), Rachel Robertson, Donald Rodrigue, Linda Shrader, Stanley Morlier, Braxton Wallace, Girard Sidora, Barbara Bastille, Har-risJjjFarlough, Harvey Johnson, Leonard Brown, John Courcier, Lillian Brown, John Gillespie, and Gail Julian.
Venison testified that Harris Farlough, Leach, Dardar and Killeen ran out their time. Killeen’s testimony was internally contradictory in part; however, it seems clear that he was aware of the practice and ran out 141.32 hours of accrued annual leave and 59.23 hours of sick leave between September and December 1988 with the full consent and participation of Helmstetter.
Porche, an employee in the Orleans Parish Constable’s Office, testified that he worked for MRBA from 1980 until August, 1988, when he went to work for the Constable. He ran out his time with MRBA from July 1988 until the end of the year. He testified in response to a question from the trial judge that the term “running your time out” was common parlance at MRBA.
Courcier testified that he was employed by MRBA for approximately eight years, commencing in October 1988. In 1989, he served as dispatcher and, as such, was the initial contact with a person calling in sick. His procedure was to fill out a sick slip, ask the reason for the sick leave request and forward the slip to the supervisor. He testified to having been advised by his supervisor that retiring or leaving employees ran their time out by claiming annual leave in lieu of sick leave.
Shaw testified that he could specifically recall that Dardar, Killeen, Leach, Morlier, Porche and Shrader ran out their time with accrued leave. The MRBA did not initiate disciplinary proceedings against any of these individuals.
Clarence Brown, a U.S. Marshal and former MRBA employee, testified that he worked for MRBA from 1984 to 1989. To his knowledge, there was nothing to prohibit the practice of running one’s time out. During the time he worked for I31MRBA, he knew personally of two officers, one of whom was his supervisor, Sergeant Dardar, who engaged in the practice.
Wilbert Venison, a former MRBA employee, testified that he, too, had run out his time when he left MRBA. The last two and one-half years of his employment, up to his departure in 1993, he worked as an undercover narcotics officer with Plaque-mines Parish, Kenner and the Louisiana State Police. He suffered a heart attack, whereupon Helmstetter told him to see Levasseur. Venison informed Levasseur of his situation and Levasseur advised him to run his time down to as close to 300 hours as possible. At trial, Levasseur denied having given that advice. Venison testified that he advised Helmstetter of Levasseur’s recommendation.
Ms. Sommer and her ex-husband, William Brown, III, also testified to the common practice of running out time. Ms. Sommer introduced Helmstetter’s letter of January 10, 1990 directed to whom it may concern, in which Helmstetter, Assistant Superintendent of MRBA police, wrote:
It is my understanding that there was some question on the amount of sick leave used by Mr. Eddie G. Killeen while employed with the [MRBA] Police Dept.
It should be noted that it was common practice for an officer to exhaust all sick leave accrued before resigning from their position as Police Officer.
Hufft testified that he was concerned Falcon intended to make his fraud charge to Customs and that he warned Falcon to be careful and to investigate the fraud charge. He told Falcon that he needed to check the background policies and to see “what was going on at this agency under Tom Short.” According, to Hufft, he had no evidence that Ms. Sommer had engaged in any fraudulent conduct or p?,acted contrary to accepted MRBA practice. Falcon never informed Hufft that the State in *942 tended to recoup funds they paid to Ms. Sommer.
We conclude from the record taken as a whole that defendants did not have a reasonable belief that Ms. Sommer’s actions were fraudulent or illegal or that she was subject to successful suit for return of the leave proceeds she had received from the State. These assignments of error are without merit.

Fourth and Eleventh Assignments of Error

The defendants argue that the trial court was clearly wrong in failing to find the communications to have been made in good faith on a subject matter in which attorney Falcon and defendants had an interest and in which Customs and Ms. Sommer’s attorney had a corresponding interest, thereby giving rise to a defense of privilege. The trial court was clearly wrong in finding that the contact made by defendants with Customs was the result of averments made in Ms. Sommer’s civil service appeal and was thus protected by privilege.
Even if plaintiff makes a 'prima facie showing of the essential elements of defamation, there is no recovery if defendant bears its burden of proving that the statement was protected by an absolute or qualified privilege. Arledge v. Hendricks, supra at p. 4, 715 So.2d at 139.
The absolute judicial privilege is not applicable to intentionally tortious actions, although' ostensibly performed for a client’s benefit. Arledge v. Hendricks, supra at p. 5, 715 So.2d at 139. The issue, according to the Louisiana Supreme Court’s holding in Montalvo v. Sondes, 93-2813 (La.5/23/94), 637 So.2d 127, is whether plaintiff shows an intent on the part of the attorney to cause direct harm to her. The privilege thus protects only against negligence or malpractice, not against | sathe sort of intentional destruction of plaintiffs career as demonstrated by the evidence of record herein.
The remaining privileges relied upon by defendants require a showing of good faith on the part of those claiming the privilege. For the reasons discussed infra, defendants cannot claim to have been in good faith in their dealings with Ms. Sommer.
This assignment of error is without merit.

Fifth Assignment of Error

The trial court was clearly wrong in finding that: (1) the communications complained of were sent by the State through its employees; (2) unidentified others in addition to Falcon had sent letters to Customs; and (3) the phrase “milking the system” was the product of defendant Wax or another state employee.
Wax testified that Falcon acted on DOTD’s behalf in sending the correspondence at issue herein, and expressed his satisfaction with Falcon’s efforts. The evidence shows that Wax would have gone even further in his pursuit of Ms. Sommer, for Falcon testified that Wax was upset with the advice that Ms. Sommer was not subject to criminal sanctions under the state ethics code. Wax also instructed Falcon to recover the leave payments Ms. Sommer had received, although Falcon never did so.
As noted infra, Falcon admitted that the phrase “milking the system” was bandied about among himself, Wax and former DOTD counsel Bonfanti.
We find no documentary evidence in the record of direct communication by DOTD/ MRBA to Customs through any representatives other than Falcon. However, he acted on behalf of the agencies, either as independent counsel or employee, and, as noted herein, conspired with other MRBA employees to defame l^Ms. Sommer. Therefore, the issue as to whether the trial court was clearly wrong in finding additional communications is moot. This assignment of error is without merit.

Sixth Assignment of Error

Defendants assert that the trial court was clearly wrong in holding that Falcon, a *943 private contract attorney, was a DOTD employee, and in finding DOTD liable for Falcon’s actions under the theory of re-spondeat superior.
The evidence clearly supports a finding that the defendants conspired to have Ms. Sommer fired from her job as a customs inspector. As co-conspirators, the State, its employees and its attorney are solidarily liable. Therefore, the issue of whether Falcon and his firm were employees or independent contractors is moot.

Seventh Assignment of Error

The defendants maintain that the trial court was clearly wrong in characterizing Ms. Sommer’s removal from the state classified system as termination rather than exhaustion of sick leave.
As noted hereinabove, Shaw testified that it was understood practice for MRBA police officers to run their time out before leaving or retiring. He objected to Short concerning the practice, but knew of no one other than himself who had objected.
Levaspeur’s alleged elimination of the time-running custom has been advanced by defendants in support of their actions against Ms. Sommer. However, we note Venison’s testimony (contradicted by Le-vasseur) that as late as 1993 Levasseur advised Venison, to run out his time.
lasThe testimony of Falcon, Shaw and Short supports the trial court’s conclusion that Ms. Sommer was terminated.
This assignment of error is without merit.

Ninth Assignment of Error

Defendants contend that the trial court was clearly wrong in finding that Ms. Som-mer was properly running out her state leave while employed by Customs.
Our disposition of the twenty-third assignment of error makes this assignment moot as to any claim that defendants violated their leave policy. The evidence referred to in our discussion of the second and third assignments of error is sufficient under the manifest error standard of review to support the trial court’s conclusion as it serves as grounds to show defendants’ malice and reckless disregard of fact with respect to Ms. Sommer’s claims of defamation and interference with her employment by Customs.
This assignment of error is without merit.

Tenth Assignment .of Error

The defendants argue that the trial court was clearly wrong in failing to find that Dr. Deese did not see Ms. Sommer until January 27, 1989; that he did not advise that Ms. Sommer was unable to return to work until April 18, 1989; that he did not declare Ms. Sommer unable to perform full police duties at MRBA; that he did not declare Ms. Sommer able to continue with Customs on a light duty basis; that he did not issue a report showing Ms. Sommer was still incapacitated.
Defendants’ brief on appéal contains no argument concerning this assignment of error. It is therefore deemed abandoned. Rule 2-12.4, Uniform Rules— Courts of Appeal.

Twelfth Assignment of Error

| ^Defendants assert that the trial court was clearly wrong in finding that actions of Falcon and defendants were a legal cause of Ms. Sommer’s damage.
Ms. Sommer testified that she sustained permanent injuries in 1994 during a narcotics arrest while employed by MRBA, and could not be rehabilitated. Ms. Som-mer did not produce medical evidence of this disability. The trial court apparently attributed this injury to defendants’ conspiracy to deprive her of her Customs job. Ms. Sommer’s theory appears to be that if she had been working for Customs, she would not have been on MRBA police duty at the time of the narcotics arrest and would not have sustained her alleged totally disabling work-related injury.
Once a duty and a breach thereof have been established, the court must de *944 termine if the breach is a legal cause of the victim’s injuries. The Louisiana Supreme Court in Roberts v. Benoit, 605 So.2d 1032 (La.1991), analyzed legal cause in terms of “proximate cause” and “cause in fact” and concluded that Louisiana has merged the two into an “ease of association” test. Roberts, supra at 1045, 1055. Although not based entirely on foreseeability, the test does encompass that factor. Essentially, the inquiry is: “How easily does one associate the plaintiffs complained of harm with the defendant’s conduct?” Carr v. City of New Orleans, 626 So.2d 374 (La. App. 4 Cir.1993).
Cause in fact is generally a “but for” inquiry; if the plaintiff probably would not have sustained the injuries but for. the defendant’s substandard conduct, such conduct is a cause-in-fact. Fowler v. Roberts, 556 So.2d 1,5 (La.1989). To the extent that the defendant’s actions had something to do with the injury the plaintiff sustained, the test of a factual, causal relationship is met. Hill v. Lundin & 137Associates, 260 La. 542, 256 So.2d 620, 622 (La.1972); Faucheaux v. Terrebonne Consolidated Government, 615 So.2d 289, 292 (La.1993).
The trial court’s implicit finding that the causation requirement was satisfied is manifestly erroneous and clearly wrong. We find no “ease of association” between the MRBA’s defamatory and malicious conduct and Ms. Sommer’s injury by a third party narcotics suspect. Ms. Sommer’s on-the-job injury was an intervening, independent cause of Ms. Som-mer’s alleged, but unproved, total, permanent disability to work at any job.
The trial court abused its discretion, in awarding $837,263 for special damages for future loss of income based on the trial court’s finding that Ms. Sommer’s total disability was caused by the defendants. Ms. Sommer allegedly sustained permanent injuries that were caused by a third party narcotics suspect after she returned to work for the DOTD and MRBA. We find no “ease of association” between the MRBA’s defamatory and malicious conduct and Ms. Sommer’s injury by a third party narcotics suspect. In its Reasons for Judgment the trial court noted that: “... plaintiff was not offered another position nor rehabilitated subsequent to her suffering several herniated discs in an ‘on the job’ [injury from the] apprehending of a drug addict after a violent physical confrontation.” It appears that the injury occurred while Ms. Sommer was working during the course and scope of her employment, and she could recover under the worker’s compensation act for any disability incurred, but she could not recover civil damages in a tort suit for her personal injury. Ms. Sommer should be -awarded loss of wages that the trial court found was a result of the loss of her Customs employment which “with overtime she could have earned as much as three times her salary with MRBA had plaintiff remained employed [at] Customs.” 13SThe special damage award should be reduced to $471,529 for future loss of wages caused by the defendants, excluding an award for her permanent disability independently caused during the narcotics arrest.

Fifteenth and Seventeenth Assignments of Error

The defendants argue that the trial court was clearly wrong in finding defendants’ actions were intentionally and maliciously motivated by a desire to deny Ms. Sommer employment with Customs. Defendants complain that the trial court was clearly wrong in finding DOTD, Short, Paisant, Wax and Levasseur solidarity liable where the record is devoid of proof of conspiracy among these parties.
Ms. Sommer testified that her immediate supervisor was Helmstetter; his immediate supervisor was Shaw; Shaw’s supervisor- was Paisant, and Short, the executive director, supervised Paisant.
Ms. Sommer testified further that she did not give Customs any of the information referred to in Customs’ termination letter of December 4, 1989. According to *945 Ms. Sommer, the information came from DOTD and Falcon. Following receipt of the letter, she noticed that with - a few exceptions the general attitude at Customs towards her was that she was accused of being a thief by a government agency.
The record is replete with evidence from Ms. Sommer and MRBA that the chain of command were knowledgeable concerning the leave policy, Ms. Sommer’s employment with Customs and Ms. Sommer’s medical condition. We find no basis for rejecting the trial court’s conclusion from the evidence that Ms. Sommer’s MRBA superiors conspired with Falcon to have Ms. Sommer dismissed not only from her job at MRBA but also from her position at Customs. Whether in j .^retaliation for her testimony in the Fleetwood case or her request for better rain gear for the men under her command or, as Ms. Sommer suggests, in resentment over her success as the first female MRBA police officer to attain permanent status, or by reason of her interracial relationship with an MRBA co-worker or for any other reason, the defendants’ actions reasonably can be characterized as a conspiracy to have Ms. Sommer fired from her initial job with MRBA and from her probationary position with Customs.
Falcon admitted that when he initiated contact with Customs, he was aware that Ms. Sommer’s status with that agency was probationary. Although he and Wax were aware that MRBA could not pursue Ms. Sommer before the civil service commission with its claim of dual employment, they did not pursue MRBA’s remedy under the ethics statute, La.R.S.42:64 and La.R.S. 42:65. Falcon testified that the ethics rale requires that suit be filed against Ms. Sommer, who would then be served and would probably make a choice between the two jobs at that point, failing which she would have been removed from one of the jobs. The defendants did not choose to pursue this legal remedy; rather, they conspired to poison the federal well so that Ms. Sommer would lose her job at Customs. Falcon admitted that DOTD, MRBA or any one of the individual defendants could have filed suit and told Ms. Sommer to vacate her federal job. Yet none of them did so.
Diedra Adams, DOTD Human Resources Director, testified as well that if an employee holds two state jobs, he is not terminated. He is given the opportunity to resign one of the jobs and keep the other.
Falcon testified that he was told by DOTD to file such a suit, but advised Wax that the suit would not recover sufficient funds from Ms. Sommer to make it |4ncost effective. Indeed, only approximately $1800 could have been recovered from Ms. Sommer, according to Falcon’s testimony.
Falcon testified in response to questioning by the trial judge that in his dealings with Customs, he was looking for a new way to fire Ms. Sommer, to recover the money she had been paid and to answer her civil service appeal. As the trial court pointed out, the simple expedient of holding a Loudermill hearing would have made an investigation unnecessary.
Falcon admitted he had used the term “milking the system” to describe Ms. Som-mer’s actions to Customs. He denied that he was the only one to use the term, which was used freely by Falcon, Wax and Bon-fanti. He admitted having characterized Ms. Sommer’s claims as “fraudulent” to Drew Hatcher of the Customs Department. Falcon also admitted having used the term “fraudulent” to describe Ms. Sommer’s actions in letters to David Hufft.
Shaw testified that he discussed Ms. Sommer’s incapacity with Paisant, advising him as he had Short and Falcon that the two medical reports made it at worst a close case that should be dropped without disciplinary action. Shaw testified in deposition that Paisant wanted him to sign a letter dictated by Paisant. He recalled the following colloquy:
What Mr. Paisant told me to the best of my memory is that he understood that *946 she was not incapacitated. I said, “The doctor’s report proved otherwise, that she would be out approximately 15 weeks.” He said, “I understand she is not and I want you to write a letter to her and tell her to return to work or whatever be the case.”
Shaw presumed Paisant wanted him to do Paisant’s “dirty work” for him, and Paisant did not want to seem like “the bad guy”. Shaw testified that his objections |41were overruled by Paisant and Short, who continued the disciplinary action against Ms. Sommer.
Paisant admitted that in his conversations with Falcon he referred to Ms. Som-mer’s incapacity as an “alleged disability” although he had in hand Ms. Sommer’s medical reports.
Ms. Sommer testified that she spoke to Paisant from Georgia and explained her knee and bronchitis problems, and forwarded supporting medical records from her Georgia physician.
Shaw testified that he and Short had discussed Ms. Sommer’s use of sick leave. He advised Short that because of Ms. Sommer’s two doctors’ reports of two on-the-job injuries, Short should let the disciplinary matter drop, advice he had also given to Falcon. Shaw testified that Short was nonetheless very persistent about pursuing the matter, despite Shaw’s advice that he seemed to be harassing Ms. Som-mer. Shaw testified that at the end of the conversation, Short threw him out of his office.
Shaw testified that, from his conversations with Short, who reported to Wax, he concluded that Wax knew of the understood practice of running out time. Wax testified that he believed Ms. Sommer was milking the system and approved of Falcon’s statements.
In any event, Ms. Sommer’s case was not investigated. Prior to termination, Ms. Sommer was not confronted with the MRBA’s allegations, asked for a response or given the opportunity to produce exculpatory evidence, a clear violation of Loud-ermill’s standard. Wax admitted that he believed Ms. Sommer was milking the system and authorized Falcon’s correspondence to Customs, although he had no information concerning MRBA leave policies and acted on an | ^uninformed assumption that Ms. Sommer had violated MRBA policy. Shaw testified that Falcon failed to ask him whether the allegations of Ms. Sommer’s misconduct were supported by evidence. Short testified that he had no reason to believe that Ms. Sommer’s medical documentation was not true and correct. Neither did Short have any reason to doubt, at the time MRBA terminated Ms. Sommer, that April 18, 1989 would be the earliest date that Ms. Sommer could return to full duty with MRBA or that the medical reports were correct.
Falcon admitted that the medical information Ms. Sommer supplied was sufficient to establish compliance with Shaw’s request for medical documentation. Falcon testified further that he did not advise Wax or anyone else with MRBA that Ms. Sommer’s medical reports were insufficient.
Paisant admitted he did not investigate thoroughly prior to arriving at the decision to terminate Ms. Sommer. According to Paisant, termination for exhaustion of sick leave offered an easy course to resolve her case. He also admitted that Ms. Sommer did not violate Civil Service anti-dual employment rules. He also admitted her attendance at Customs Academy while on annual leave was permissible. Significantly, he admitted that the appropriate course of action where there IS a violation of the dual employment rule is to require the employee to choose one of the two jobs and to resign the other — NOT to terminate the employee. See also, La.R.S. 42:65.
The evidence taken as a whole supports the trial court’s finding of conspiracy. These assignments of error are without merit.

*947
Sixteenth Assignment of Error

LaDefendants contend that the trial court was clearly wrong in finding a pattern of harassment intended to make Ms. Sommer’s re-employment by DOTD short-lived.
A claim of harassment would be under the jurisdiction of the Civil Service Commission. Because of our resolution of the jurisdictional issue, this assignment of error is moot.

Nineteenth, Twentieth and Twenty-first Assignments of Error

The defendants aver that the trial court was clearly wrong in finding Short liable for defamation, intentional interference with employment, intentional infliction of mental distress and deprivation of constitutional rights because he: (1) was not consulted about contacting Customs; (2) had no knowledge of Falcon’s communications; (3) had no direct involvement after Ms. Sommer was removed from MRBA for exhaustion of sick leave; and (4) at all times acted in good faith in his official capacity.
The defendants also assert that the trial court was clearly wrong in finding Wax liable for defamation, intentional interference with employment, intentional infliction of mental distress and constitutional deprivations where he: (1) had no direct involvement in Ms. Sommer’s removal from MRBA for exhaustion of sick leave; (2) did not pre-approve any communications made by Falcon to Customs or to Ms. Sommer’s counsel; (3) was unaware if documents were received from Customs; (4) relied upon Falcon’s expertise as an attorney in handling Ms. Sommer’s civil service appeal; and (5) at all times acted in good faith in his official capacity.
The defendants argue that the trial court was clearly wrong in finding Paisant liable for defamation, intentional interference with employment, intentional 144infliction of mental distress and constitutional deprivations where he: (1) telephoned Customs in May 1989 at Falcon’s request solely to verify that Sommer was employed; (2) had no knowledge of the substance of Falcon’s communications; (3) had no other involvement with Customs; (4) had no involvement in Ms. Sommer’s civil service appeal until April 1990, when he testified at the civil service hearing; and (5) at all times acted in good faith in his official capacity.
For the reasons discussed in the foregoing assignments of error, this assignment of error is without merit.

Twenty-second Assignment of Error

The defendants submit that the trial court was clearly wrong in finding Levasseur liable for defamation, intentional interference with employment, intentional infliction of mental distress and constitutional deprivations where: (1) he was not employed by DOTD until after Ms. Sommer’s termination by Customs; and (2) at all times acted in good faith in his official capacity.
Ms. Sommer does not address Levass-eur’s specific responsibility in her brief on appeal. We note from our review of the record that in the course of the attorneys’ colloquy with the trial court concerning defendants’ motion for directed verdict, counsel for Ms. Sommer relied on Falcon’s testimony that each of the individual defendants had the ability to file an ethics action under La.R.S. 42:65 to require Ms. Sommer to elect which job, state or federal, she would pursue. According to counsel, Levasseur was not an MRBA employee until December 1989, when he became executive director.
It is undisputed that Levasseur had not come on board MRBA until AFTER Ms. Sommer’s termination by Customs. Le-vasseur testified without contradiction |45that he had no contact with Customs concerning Ms. Sommer. It is likewise clear that Falcon did not discuss Ms. Som-mer’s case with Levasseur prior to having made the defamatory communications. Simply stated, Levasseur was not in a position to defame Ms. Sommer to Cus *948 toms, to conspire to have her fired by Customs or to interfere with her contract with Customs because she was no longer a Customs employee when he became an MRBA employee.
According to Levasseur’s testimony, he was appointed executive director of MRBA in December 1989. Ms. Sommer’s counsel established through Levasseur’s brief testimony that Levasseur was not made aware of Ms. Sommer’s civil service proceeding. No one gave him a choice as to whether or not to continue pressing the proceeding or dismissing it, and no one advised him that he had a right to file a civil action against Ms. Sommer for dual employment. Levasseur testified that had he known of the possibility of such a suit (which, as we have noted infra would have given Ms. Sommer the right to elect between her two jobs), he would have filed suit. Neither Falcon nor the other state defendants advised Levasseur that this legal avenue was available to MRBA.
In denying Levasseur’s motion for a directed verdict, the trial court relied on Ms. Sommer’s counsel’s suggestion that Le-vasseur was in place during part of the time period relevant to Ms. Sommer’s claim for harassment. However, in light of our finding that these post-Customs complaints are within the exclusive jurisdiction of the State Civil Service Commission, there is no basis for judgment against Levasseur.
The record provides no factual basis for a finding that Levasseur was part of the conspiracy to defame Ms. Sommer or to violate her civil rights. Therefore, we conclude that the trial court’s judgment casting Levasseur for damages is | ¿¿manifestly erroneous and clearly wrong and amend the judgment to remove Levasseur as a judgment debtor.

Twenty-Sixth Assignment of Error

Defendants claim that the award of general, compensatory and special damages is manifestly erroneous, excessive or speculative.
According to Dr. Wolfson’s uncontro-verted calculations, Ms. Sommer lost $80,-773 between 1989 and September 16, 1996, based on her salary with Customs. Dr. Wolfson’s projected future loss estimate of $837,263 was based on his projection of the total loss of income occasioned by Ms. Sommer’s total disability which she contended precludes her from any continued employment. Because of our finding that there is no evidentiary support for the trial court’s finding MRBA responsible for Ms. Sommer’s alleged permanent disability, which was caused by the encounter with the narcotics suspect, we cannot accept the economist’s projection of $837,263 lost future wages.
As to future loss absent the alleged disability, Dr. Wolfson tried to estimate how much Ms. Sommer would have been able to make with the federal government today, less what she might have been expected to earn had she remained with the State, and that present value amounted to $390,756. This figure assumes a seven percent discount and does not include any fringe benefits or differential loss, nor does it take into account possible promotion. We find that figure to be supported by the evidence.
Because the trial abused its discretion in attributing her total disability to these defendants, we amend the award of special damages. We award lost income to date of trial ($80,773) plus the present value of the difference between her expected future wages with Customs and expected future wages with MRBA |47($390,756), for a total of $471,529. Because these special damages were caused by both the defamation and civil rights violation, the State, MRBA, DOTD, Paisant, Short and Wax are solidarity liable for the special damages.
Damages for defamation can include injury to reputation, personal humiliation, embarrassment, and mental anguish and suffering. Thomas v. Busby, 95-1147 p. 8 (La.App. 3 Cir. 3/6/96), 670 So.2d 603, 609. In the present case we *949 find no abuse of the trial court’s vast discretion in awarding Ms. Sommer $1,000,-000 in general damages for loss of reputation caused by the defendants’ malicious, intentional, willful misconduct, and mental suffering and distress intentionally inflicted by the defendants. Instances of the defendants’ outrageous conduct warrant recovery for mental anguish. Succession of Harvey v. Dietzen, 97-2815 (La.App. 4 Cir. 6/24/98, 716 So.2d 911), writ denied, 98-2025 (La.11/6/98), 728 So.2d 391; Smith v. Mahfouz, 489 So.2d 409 (La.App. 3 Cir. 1986), writ denied 494 So.2d 1181 (La.1986). Under 42 U.S.C. § 1983, plaintiff may recover for mental and emotional distress, community humiliation, and loss of professional reputation caused by the infringement of her constitutional rights and interest. Knapp v. Whitaker, 757 F.2d 827 (C.A. 7 111.1985), certiorari denied, 474 U.S. 803, 106 S.Ct. 36, 88 L.Ed.2d 29 (1985).
In the present case, Ms. Sommer continues to suffer the destruction of her emotional life, and incurs mental distress and personal devastation in the future for loss of her ability to be a customs agent, which was her ultimate ambition. The defendants inflicted not just one instance of a single defamatory publication. Ms. Som-mer suffered mental distress from defamatory publications over a long period of time. Under Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993), certiorari denied, Maritime Overseas Corp. v. Youn, 510 U.S. 1114, 114 S.Ct. 1059, U 127 L.Ed.2d 379 (1994), the trial court did not abuse its vast discretion in its award of general damages in the present case.
In light of the extensive record below, consisting of approximately two thousand pages of testimony, several volumes of pleadings, two large boxes of exhibits and two large envelopes of exhibits documenting this case, the extensive discovery and preparation involved in the prosecution of the case in the trial court alone over a period of six years, we do not find the award of attorney’s fees in the amount of fifteen percent of the total award to be an abuse of the trial court’s discretion. Likewise, we find the punitive damage award of fifteen percent of the total recovery to be supported by the evidence.

Conclusion and Decree

Considering the foregoing, we reject that portion of the judgment finding defendants liable for Loudermill violation, intentional interference with Ms. Sommer’s employment by MRBA, discrimination and harassment during her second period of employment by MRBA as those claims are under the exclusive jurisdiction of the Civil Service Commission. We, reverse the trial court’s denial of defendant Levasseur’s motion for a directed verdict dismissing him from this suit. The following defendants are liable in solido: the State through DOTD and MRBA, J.L. Wax, Randall Paisant, and Thomas Short. The award of special damages for loss of past and future earnings is amended to $471,-529. In all other respects, the judgment is affirmed.
|43The following is a review of the amended damage award:
General damages: $1,000,000.00
Revised Lost Income: +471,529.00
Subtotal: $1,471,529.00
PLUS
Punitive damages
(15% of total award of
revised $1,471,529.00): $ 220,729.35
Attorney’s fees
(15% of total award of revised $1,471,529.00): +220.729.35
Subtotal: $ 441,458.70
General Damages & Revised Lost Income $1,471,529.00
Revised Punitive & Attorney’s Pees: +441,458.70
TOTAL: $2,278,721.70
PLUS INTEREST
Accordingly, the judgment of the trial court is affirmed as amended.

AFFIRMED AS AMENDED.

WALTZER, J., CONCURS IN PART AND DISSENTS IN PART WITH REASONS.

. We note that there are two types of defama-lion, written (libel) and oral (slander).

. See, LSA-Const. Art. 5, section 10(B).